IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:19-cv-250-FL

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S RESPONSE TO** |
| v. | ) | **DEFENDANT'S MOTION TO DISMISS** |
| | ) | |
| C.B., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pursuant to Local Civil Rules 7.1(f) and 7.2., Plaintiff Epic Games, Inc. ("Plaintiff" or "Epic") submits this response to Defendant C.B.'s ("Defendant" or "C.B.") Motion to Dismiss.

## I.      INTRODUCTION

Epic sued Defendant because he is in the business of misusing Epic's copyright-protected player vs. player (PvP) video game *Fortnite Battle Royale* ("Fortnite") to create, promote, and sell his cheat software ("cheats" or "hacks"), which he and his customers use to cheat while playing Fortnite. (Complaint [DE 1] ("Comp.") ¶¶7-9, 56-91.) Defendant promotes his business by posting videos of himself playing and cheating at Fortnite, and providing links and other information about where to buy and how to use his cheat software in these posts. (Comp. ¶¶78-80.) His cheats (a) unlawfully circumvent technical measures put in place by Epic to protect access to Fortnite's copyrighted software, and (b) inject code into Fortnite that alters the game Epic's software creates, giving those who use it a competitive advantage. (Comp. ¶¶5-16, 56-69.)

Fortnite® was created to be a game that can be played and won for free.[1] Fortnite players may buy cosmetic items in Fortnite's in-game Item Store using V-Bucks, Fortnite's in-game currency, but Epic does not sell anything that provides purchasers with a competitive advantage. (Comp. ¶28.) This was a deliberate choice by Epic to ensure a fair playing field for all players. (*Id.*)

Defendant's business infringes Epic's copyrights in Fortnite and disrupts the game. Defendant is knowingly engaging in this wrongful behavior and does not hide that fact. On the contrary, he brags about what he is doing. For instance, he told his approximately 14,000 followers and the tens of thousands of others who watch his videos on YouTube that he was "cheating in fort again," (Comp. ¶82), published videos of his "HACKING GAMEPLAY" (Comp. ¶79), and, most recently, admitted that he "very, very rarely" plays Fortnite "legit," ([DE 22] Declaration of Catherine Lawson ("Lawson Dec."), ¶19, Exh. 9).

Neither Defendant nor his customers can access Fortnite without first agreeing to Epic's Terms of Service ("TOS") and the Fortnite End User License Agreement ("EULA"). (Comp. ¶¶35, 47.) Each agreement requires that disputes concerning intellectual property infringement or the creation, distribution, or promotion of cheats be adjudicated in this Court. (*Id.* ¶¶41-44, 50-53.) Defendant's statements make clear that he has always been fully aware that his conduct is unlawful, is specifically directed at Epic, and carries with it certain consequences. His arguments that he is immune from those consequences, including his claim that this Court does not have jurisdiction over him because "he's a kid," (Memorandum of Law in Support of Defendant's Motion to Dismiss [DE 17] ("Defendant's Brief" or "Def. Br."), p.2.), are without merit.

---

[1] Fortnite has several different game modes: (1) a player vs. environment (PvE) mode known as *Fortnite Save The World*, (2) a creative mode known as *Fortnite Creative*, and (3) *Fortnite Battle Royale*. Unless specified otherwise, references to "Fortnite" herein are to *Fortnite Battle Royale*.

PPAB 5081023v7

Defendant's motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    EPIC AND FORTNITE.

Epic is a Cary, North Carolina-based developer and publisher of video games and content creation software. (Comp. ¶22.) Since its broad release two years ago, Fortnite has garnered close to 250 million registered accounts. (Comp. ¶¶23, 25.) Epic is the author and owner of all right, title, and interest in the copyrights in Fortnite, including its computer software and the audio-visual works that software creates. (Comp. ¶33.)

### B.    REQUIREMENTS FOR ACCESSING FORTNITE.

In order to play Fortnite on his or her personal computer (PC), a would-be user must first download and install it (Lawson Dec. ¶3), just as Defendant acknowledges having done. (Declaration of C.B. [DE 19] ("C.B. Dec.") ¶12.) This requires going to the Epic Games Store (available at: <epicgames.com/store>) ("Epic Games Store") and clicking the Fortnite icon. (Lawson Dec. ¶4-5, Exhs. 1-2.) Doing so takes the would-be user to the Fortnite page, from which Fortnite Battle Royale may be downloaded by clicking on a button which reads "GET". (*Id.*) After clicking the "GET" button, the user must sign in to his or her Epic Games account, or create an account if he or she has not already done so. (Lawson Dec. ¶6.)

To create an account with Epic, a would-be user must provide his or her first name, last name, and email address, create a display name and password, and then click on a button which affirms: "I have read and agree to the terms of service." (Lawson Dec. ¶8.) On the would-be user's screen, "**terms of service**" appears in bright blue font set against a white background and

hyperlinks to Epic's TOS.[2] (*Id.*, Exh. 3.) The would-be user must then click the "Create Account" button to complete the account creation process. (*Id.*)

After signing into his or her account, a window with the scrollable Fortnite® EULA opens on the would-be user's screen.[3] (Lawson Dec. ¶9.) The would-be user may then read the EULA and either (a) check a box that reads "I have read and agree with the End User License Agreement," and click the "Accept" button, (which is not available unless the would-be user first indicates he or she has read the EULA,) or (b) click the "Dismiss" button. (*Id.*) Would-be users who click "Dismiss," or who close the page without clicking "Accept," cannot download or install Fortnite. (*Id.*) Those who acknowledge that they "have read and agree with the End User License Agreement" may download and install Fortnite, just as Defendant has done. (C.B. Dec. ¶12.)

## C. DEFENDANT'S ONGOING TAKING OF CONTRACTUAL BENEFITS AND VIOLATION OF EPIC'S RIGHTS.

Defendant operates at least two YouTube channels under the screen name "CBV." (Comp. ¶¶6-7, 74; Lawson Dec. ¶¶10, 14, Exhs. 4, 8.) He posts videos showing himself playing and cheating at Fortnite on both channels. Between February 3, 2018 and the filing of this lawsuit, Defendant posted at least six videos of himself playing and cheating at Fortnite on his primary channel. (Comp. ¶77, Exh. B.) These videos contained links to websites where cheaters and would-be cheaters could purchase the cheats and hacks Defendant demonstrated in the videos. (Comp. ¶¶78-80.) On Defendant's YouTube Community page, he would frequently provide advice to customers who had purchased his cheat software but were having difficulty using it. (Comp. ¶81, Exh. F.)

---

[2] Epic's TOS is also accessible by a link at the bottom of the Epic Games Store webpage along with legal notices and store policies. (Lawson Dec. ¶8.)
[3] The EULA is also accessible on Fortnite.com. (Lawson Dec. ¶9.)

PPAB 5081023v7

Between May 20 and June 5, 2019, Epic submitted three notices to YouTube under the Digital Millennium Copyright Act ("DMCA") concerning a total of six Fortnite cheat-related videos posted by Defendant that infringed Epic's copyrights.[4] (Comp. ¶84; [DE 21] Declaration of John Farnsworth ("Farnsworth Dec.") ¶3.) Collectively, those videos were viewed over 550,000 times before Epic submitted the notices to YouTube. (Lawson Dec. ¶10.) In response to the June 5 DMCA notice, Defendant submitted a counter notification to YouTube in which he claimed that the videos were a protected fair use. (Comp. ¶86.) He then went on his YouTube Community page and bragged that he was about to be sued by Epic: "***basically epic has 10-14 days to sue me, <u>if they don't sue then I get my strikes and channel back</u>. sick <u>about to get sued by epic</u>.***" (Comp. ¶87, Exh. I) (emphasis added). As Defendant recognized in this post, because he filed the counter notification, Epic's only recourse if it was to prevent the videos from being restored under 17 U.S.C. § 512(g)(2)(C) was to file an action within the statutory time period. (*See id.*)

Epic filed its Complaint on June 18, 2019, and served Defendant with the Complaint and Summons on June 22, 2019. (*See* DE 1, DE 11.) Defendant responded by posting more videos. In the first of these, published on June 21, 2019, Defendant reads and discusses the contents of the Complaint. (Lawson Dec. ¶11, Exh. 5.) He also says Epic is suing him "just because I made Fortnite cheats . . . just because I *allegedly* made Fortnite cheats." (*Id.*) In the second video, published on June 22, 2019, Defendant tells his audience that he "already has a pretty good attorney." (Lawson Dec. ¶12, Exh. 6.) The posts for both videos contain links to the website of Defendant's organization, "Nexus Cheats," from which Defendant's cheats may be purchased. (Lawson Dec. ¶13, Exh. 7.)

---

[4] These three DMCA notices were submitted on May 20, June 4, June 5, the last of which concerned four videos. (Farnsworth Dec. ¶3.)

PPAB 5081023v7

Defendant did not stop his infringing behavior after being served with Epic's Complaint and retaining legal counsel. Instead, on July 15, 2019, he created a second YouTube channel and published a new video titled "Fortnite AIMBOT/WALLHACKS/**LIVE**(nexuscheats)."[5] (Lawson Dec. ¶15, Exh. 9.) In this 87-minute long video, Defendant announced it was his "first time streaming since I've been sued . . . ." (Lawson Dec. ¶16.) He then live-streamed himself logging into Fortnite and demonstrating his hacks as he played the game. During the stream, Defendant answered questions posted by viewers in real time. When asked about the lawsuit, Defendant assured his viewers (and customers) that "we have a very, very good attorney . . . ." (*Id*.)

Much of this video was spent conducting tech support for his customers, whose messages Defendant read out loud as he cheated at Fortnite. (Lawson Dec. ¶17.) During this profanity-laced Q&A session, Defendant discussed being banned by Epic. (*Id*., Exh. 9.) He boasted that "the only cheat that we inject with Discord overlay is Fortnite, and that's just because we're very sophisticated. Because Epic is on our ass 24/7." (*Id*.) Defendant contradicted complaints that his hacks were not working by pointing out "you just watched me spoof live in front of you."[6] (Lawson Dec. ¶17, Exh. 9.) Defendant acknowledged Epic's efforts to prevent him and others from using the hacks he sells to cheat at Fortnite, commenting that: "we get detected like once a week and we update overnight." (Lawson Dec. ¶18.) In some instances, Defendant told his viewers to "submit a ticket" and he would get back to them, or to "make a ticket to my staff, Tim

---

[5] "Aimbots" and "wallhacks" are different types of cheat software. Aimbots enable those who use them to automatically target and kill other players without having to carefully aim their weapons. (Comp. ¶61.) Wallhacks enable those who use them to see other players hiding behind walls and other obstructions. (*Id*.)

[6] "Spoofing" is using software to hide one's identity in order to, for example, circumvent a cheating ban by disguising the Hardware ID (HWID) that uniquely identifies the user's computer. (*See* Comp. ¶61.)

will tell you what to do." (Lawson Dec. ¶¶17-18.)

Epic submitted a DMCA notice concerning this video on July 22, 2019 and the video was removed by YouTube. (Farnsworth Dec. ¶4.)

Defendant continues to develop and sell cheat software specifically targeted at Epic and Fortnite. Indeed, Defendant has created a new website located at <NexusCheats.us>, a domain name Defendant registered on August 1, 2019. (Lawson Dec. ¶20, Exh. 10.) On or around August 13, 2019—*more than a week after he signed his declaration stating he had not read the EULA or TOS and did not know Epic is headquartered in North Carolina*, (C.B. Dec. ¶¶ 12-16)—Defendant posted the following message on his YouTube Community page: "**https://nexuscheats.us/shop/** *new shop is up. status video coming soon <3*." (Lawson Dec. ¶21, Exh. 11.) (emphasis added.) Defendant's new website offers Fortnite cheats and uses copyright-protected Fortnite images to promote them. (Lawson Dec. ¶22, Exh. 12.)

## III.  STANDARD OF REVIEW

Where the court "addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a *prima facie* showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989). In assessing whether the plaintiff has met his burden, the district court must "draw the most favorable inferences for the existence of jurisdiction." *Id.*

## IV.  ARGUMENT

This Court has jurisdiction over Defendant on two independent grounds. First, the Court has jurisdiction over Defendant because he repeatedly consented to the jurisdiction of this Court and repeatedly agreed that venue is proper here. Second, this Court has jurisdiction over

7

Defendant under North Carolina's long-arm statute, and its exercise of such jurisdiction is constitutionally reasonable and comports with due process because (a) Defendant purposefully availed himself of the privilege of conducting activities in North Carolina, and (b) his tortious conduct satisfies the United States Supreme Court's *Calder* test. Whichever avenue this Court takes, the outcome is the same: Defendant is subject to this Court's jurisdiction.

**A.** **DEFENDANT ENTERED INTO VALID AND ENFORCEABLE CONTRACTS WITH EPIC, TOOK AND RETAINED BENEFITS FROM THOSE CONTRACTS, AND CANNOT AVOID THEM.**

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Defendant waived any objections to either venue or jurisdiction when he agreed to the TOS and EULA to have access to and play Fortnite.

**1.** **Defendant entered into valid and enforceable contracts with Epic.**

In North Carolina, the elements of a valid, enforceable contract are offer, acceptance, and consideration. *Lewis v. Lester*, 235 NC App 84, 760 S.E.2d 91 (2014). Under this standard, Defendant assented to and entered into valid and enforceable contracts with Epic when he agreed to the TOS and EULA (sometimes collectively, the "agreements").

**a.** Defendant entered into valid click-through agreements with Epic.

Defendant has created accounts with Epic and has installed Fortnite on his PC. (C.B. Dec. ¶12; Comp. ¶¶35, 47; Farnsworth Dec. ¶7.) He could not have done so without agreeing to the EULA and TOS. (Comp. 35, 47.)

Courts across the country have repeatedly held that "click-wrap" contracts and other agreements entered into online are valid and enforceable. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d. Cir. 2004) ("While new commerce on the Internet has exposed

courts to many new situations, it has not fundamentally changed the principles of contract.")
(internal citations omitted); *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1175-76 & n.6
(W.D. Wash. 2014) (upholding clickwrap terms of use with unilateral modification clause);
*Koresko v. RealNetworks, Inc.*, 291 F.Supp. 2d 1157, 1162-63 (E.D. Cal. 2003) (clicking box on
the screen marked, "I agree" on website evinced express agreement to terms); *In re
RealNetworks, Inc.*, 2000 WL 631341, at *1, 5–6 (N.D. Ill. May 11, 2000) (finding reasonable
notice of clickwrap agreement terms existed where the user had to agree to the terms in order to
install software, the agreement came in a small pop-up window, in the same font-size as words in
the computer's own display, and with the arbitration clause located at the end of the agreement.).

Defendant admits that he has "installed and played the *Fortnite* video game on [his]
personal computer." (C.B. Dec. ¶12.) When he installed Fortnite and created an account to play
it, he affirmatively agreed to both the TOS and the EULA and all of their respective terms,
regardless of whether he read them or not. *See, e.g.*, *Feldman v. Google, Inc.*, 513 F. Supp. 2d
229, 236 (E.D. Pa. 2007) ("Absent a showing of fraud, failure to read an enforceable clickwrap
agreement, as with any binding contract, will not excuse compliance with its terms.")

      b.     The EULA and TOS contain express and enforceable forum selection
             clauses and waivers of jurisdictional objections.

The EULA and TOS both provide that users and Epic will submit to the exclusive
jurisdiction in North Carolina and in this Court, and that the user agrees to "waive any
jurisdictional, venue or inconvenient forum objections." (Comp. ¶¶43, 52; DE 1-5, pp.3-4; DE 1-
6, p.7.) Defendant has not asserted that either the forum selection clauses or the waivers of
jurisdictional objections are unenforceable on their own merit, and he cannot credibly do so. The
general rule is that forum selection clauses are "*prima facie* valid and should be enforced unless
enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S*

*Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972). North Carolina has expressly adopted this general rule:

> [W]e embrace the modern view and hold that forum selection clauses are valid in North Carolina. A plaintiff who executes a contract that designates a particular forum for the resolution of disputes and then files suit in another forum seeking to avoid enforcement of a forum selection clause carries a heavy burden and must demonstrate that the clause was the product of fraud or unequal bargaining power or that enforcement of the clause would be unfair or unreasonable.

*Perkins v. CCH Computax, Inc.*, 333 N.C. 140, 146, 423 S.E.2d 780, 784 (1992) (analyzing the common law justification favoring the enforcement of forum selection clauses; later superseded by N.C. Gen. Stat § 22B3 (1993), which requires that disputes over contracts entered into in North Carolina should be litigated in North Carolina).

The general rule in favor of finding forum selection clauses enforceable has been extended specifically to forum selection clauses in click-wrap (or click-through) agreements. *See TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377 (S.D.N.Y. 2010), *aff'd in part*, 647 F.3d 472 (2d Cir. 2011), *and aff'd in part*, 435 F. App'x 31 (2d Cir. 2011) ("The Second Circuit 'regularly enforce[s]' forum selection clauses as long as 'the existence of the clause was reasonably communicated to the parties.'"); *Hugger–Mugger, L.L.C. v. Netsuite, Inc.*, 2005 WL 2206128, at *7 (D. Utah Sept.12, 2005) (enforcing a forum selection clause contained in a click-wrap agreement); *Siebert v. Amateur Athletic Union of the U.S., Inc.*, 422 F.Supp.2d 1033, 1040 (D. Minn. 2006) (noting that most courts that have considered the issue "have upheld arbitration and forum selection clauses in so-called 'clickwrap' or 'shrinkwrap' form contracts," which occur "when the terms are provided online, or only after plaintiffs have manifested assent").

Moreover, the United States Supreme Court has held that forum selection clauses operate to waive objections based on personal jurisdiction. *See Carnival Cruise Lines, Inc. v. Shute*, 499

U.S. 585, 589 (1991) ("Because we find the forum-selection clause to be dispositive of this question, we need not consider petitioner's constitutional argument as to personal jurisdiction."). But even if the forum selection clauses in the TOS and EULA were not waivers of objections based on jurisdiction, the actual jurisdictional waivers in the agreements are also enforceable under normal rules of contract. "Personal jurisdiction can be waived, which means that parties to an agreement may contract around principles of personal jurisdiction by consenting to resolve their disputes in specified tribunals." *See IHFC Properties, LLC v. APA Mktg., Inc.*, 850 F. Supp. 2d 604, 618 (M.D.N.C. 2012) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 n.14 (1985)) (internal quotation marks omitted).

>   **2.**    **Defendant is barred from asserting the infancy doctrine to disavow his obligations under his agreements with Epic.**

Defendant raises two arguments regarding the enforceability of the EULA and the TOS: (a) "agreements with minors are unenforceable" (Def. Br., p.2), and (b) "the very agreements which Epic rely [sic] on explicitly state that children cannot enter those agreements." (*Id.*) The Court should reject both arguments because each relies on misstatements of the law and the facts.

>   a.    <u>Contracts with minors are not void, they are voidable subject to exceptions.</u>

Defendant's assertion that "any agreements with him are void," (Def. Br., p.4) mischaracterizes the law and the decision he cites in support of this mischaracterization. *See Kelly v. United States*, 809 F. Supp. 2d 429, 434 (E.D.N.C. 2011) ("[B]ecause a minor lacks legal capacity there cannot be a valid contract *in most transactions* . . . Accordingly, contracts entered into by a minor, except those for necessities or authorized by statute, *are voidable* at the election of the minor, and may be disaffirmed.") (emphasis added). As this Court recognized in

*Kelly*, contracts with a minor are not void, as Defendant suggests, but voidable subject to certain exceptions. *See id.* [7]

> b.  <u>Defendant cannot use the infancy defense to disaffirm his contractual obligations because he has retained the benefits of his agreements with Epic.</u>

One such exception provides that "[i]f an infant enters into any contract subject to conditions or stipulations, he cannot take the benefit of the contract without the burden of the conditions or stipulations." 5 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 9:14 (4th ed. 1993 & Supp. July 2019) ("*Williston on Contracts*"). Thus, courts have long recognized that "[t]he infancy defense may not be used inequitably to retain the benefits of a contract while reneging on the obligations attached to that benefit." *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 899 (S.D. Ill. 2012) (citing *MacGreal v. Taylor*, 167 U.S. 688, 701 (1897)); *see also A.V. v. iParadigms Lab. Co.*, 544 F. Supp. 2d 473, 480–81 (E.D. Va. 2008), *aff'd in part, rev'd in part sub nom. A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) ("Plaintiffs cannot use the infancy defense to void their contractual obligations while retaining the benefits of the contract. Thus, Plaintiffs' infancy defense fails."); *Wright v. Hepler*, 194 N.C. 542, 140 S.E. 90, 91 (1927) ("[A]n infant . . . will [not] be permitted to repudiate a transaction upon the ground of a want of capacity, or for other sufficient cause, and at the same time retain and enjoy any benefit derived from it.") (citation omitted); *cf. Baker v. adidas Am., Inc.*, No. 5:07-CV-168-FL, 2008 WL 11429938, at *5-6 (E.D.N.C. Mar. 5, 2008),

---

[7] Defendant takes the position that "[a] choice of law analysis would not change the result because it would be the same whether Illinois or North Carolina law applies." (Def. Brief, p.4, n.1.) Epic agrees that the infancy defense is a common law principle and provides authority herein showing that it is inapplicable to this case under both North Carolina and Illinois law. North Carolina law applies under the terms of the EULA and TOS. (*See* Comp. ¶¶41, 50; DE 1-5, p.4; DE 1-6, p.7.)

PPAB 5081023v7

*aff'd*, 335 F. App'x 356 (4th Cir. 2009) (finding defendant could not disavow contract under the infancy doctrine because of her continued acceptance of benefits under the contract).

Two recent cases are directly relevant. In *iParadigms*, the court held that the minor plaintiffs could not use the infancy defense to avoid obligations imposed by a click-wrap agreement after having received the benefits of the contract, namely, their use of the defendant's website. 544 F. Supp. 2d at 480–81. Similarly, in *E.K.D. ex rel. Dawes*, the court concluded that the minor plaintiffs residing in Illinois, California, Ohio, and Nevada, who had used Facebook.com, could not disaffirm the forum selection clause in Facebook's Terms of Service (TOS). 885 F. Supp. 2d at 898-900.

Prior to so holding, the court analyzed whether Facebook was barred by the infancy doctrine from enforcing the forum-selection clause against the minor plaintiffs. *Id*. In the course of its analysis, the court considered the common law principles of equity that govern the application of the infancy doctrine. Specifically, the court recognized "the equitable principle that minors, if they would disaffirm a contract, must disaffirm the entire contract, not just the irksome portions. . . [N]o person, whether minor or adult, can be permitted to adopt that part of an entire transaction which is beneficial, and reject its burdens." *Id*. at 899 (internal citations omitted.) The court further recognized:

> This commanding principle of justice is so well established, that it has become one of the maxims of the law. Minors must either accept or repudiate the entire contract, and they cannot retain the contract's fruits and at the same time deny its obligations. A party cannot apply to his own use that part of the transaction which may bring to him a benefit, and repudiate the other, which may not be to his interest to fulfill.

*Id*. (internal citations omitted.)

Applying these principles to "the specific context of forum-selection clauses," the court noted that other courts "have readily declined to permit minors to accept the benefits of a

contract, then seek to void the contract in an attempt to escape the consequences of a clause that does not suit them." *See id*. (surveying cases). The same principles apply here with the same results

Defendant agreed to the TOS in order to create an account with Epic and entered into the EULA in order to download and install Fortnite on his personal computer ("PC"). (Comp. ¶¶ 35, 47; C.B. Dec. ¶12.) Assent to the terms of the TOS and EULA are conditions precedent to being able to download and play Fortnite. (*Id*.) At all times relevant to the Complaint, Defendant played Fortnite. (Comp. ¶¶ 6, 13-15, 56-59, 65, 75, 77-79; Lawson Dec. ¶¶10-22; Farnsworth ¶10.) At all times relevant to the Complaint, Defendant used Fortnite to create, promote, and sell cheat software, (Comp. ¶¶7, 13, 14, 58, 59, 66, 67, 69, 73-91, 102, 118, 142; Lawson Dec. ¶¶10-22,) and, in doing so, infringed Epic's copyrights. (Comp. ¶¶ 5, 14, 76, 92-126.)

Epic has banned Defendant from accessing Fortnite at least three times because of his use of cheat software in violation of the TOS and EULA. (Farnsworth Dec. ¶ 6.) Defendant circumvented these bans by creating new accounts under false names, which, each time, required that he agree again to the TOS, including its forum selection and consent to jurisdiction. (Farnsworth Dec. ¶ 7; Comp. ¶¶35, 41; Lawson Dec. ¶¶7-8.) On information and belief, Defendant also downloaded and installed Fortnite multiple times, which, each time, required that he again agree to the EULA, including its forum selection and consent to jurisdiction. (Comp. ¶47, 50-52; Lawson Dec. ¶¶3-6, 9.)

Defendant also continued to play and use Fortnite to create cheat software after Epic had submitted four different DMCA complaints concerning a total of seven videos. (Comp. ¶¶74-84; Exhs. B–H; Farnsworth Dec. ¶10.) Moreover, Defendant submitted a DMCA counter notification, putting Epic in a position where it had to either file the instant lawsuit or allow the

video to remain posted on YouTube. *See* 17 U.S.C. § 512(g)(2)(C); (Comp. ¶¶84-87, 99, 107, 116, 124; Exh. I.) After Defendant submitted the counter notice, he bragged on his YouTube community page that Epic was about to sue him. (Comp. ¶87; Exh. I.)

By playing Fortnite after he was properly served with the Complaint and the Summons issued by this Court and after he had hired an attorney (*see* Lawson Dec. ¶¶11-19), Defendant has demonstrated that he is continuing to use the benefits of his access to Fortnite (and the agreements that gave him access to it) after he was familiar with Epic's claims, aware of this Court's jurisdiction over him, and able to consult with a lawyer. Not only did he continue to use his access to Fortnite to cheat at the game after being served with the Complaint, he continued to publish videos promoting and supporting his cheat software in violation of both Epic's rights under the Copyright Act—which are the subject of this lawsuit—and the terms of the agreements that give Defendant access to Fortnite in the first place.

Thus, during all times relevant to Epic's Complaint, Defendant continued to avail himself of the benefits that he took from his license to use Fortnite. Defendant continues to use and retain the benefits of those agreements by accessing Fortnite and using it to create, publish, and broadcast promotional videos for his cheat software. (*See* Comp. ¶83; Lawson Dec. ¶¶11-22.) Defendant is not permitted by the common law to retain the benefits of his contracts with Epic, have his lawyers say "he's a kid" (Def. Brief, p.3), and avoid the consequences of abusing the benefits he received. *See, e.g.*, *iParadigms*, 544 F. Supp. 2d at 480–81; *E.K.D. ex rel. Dawes*, 885 F. Supp. 2d at 898-900.

Nor is Defendant permitted to use the portions of the contract that are favorable to him while at the same time disaffirming the portions that are burdensome. *See, e.g.*, 7 Joseph M. Perillo, Corbin on Contracts § 27.4 at 9 (Rev. ed. 2002 & Supp. 2013) ("[t]he infant is not

entitled to enforce portions [of the contract] that are favorable and at the same time disaffirm other portions that are burdensome"); *Power v. Allstate Ins. Co.*, 312 S.C. 381, 383, 440 S.E.2d 406, 407 (Ct. App. 1994) (minor "must either affirm or disaffirm his contract *in toto* and is not allowed to affirm beneficial terms of the policy and disaffirm the burdensome ones."). Defendant is barred by both law and equity from asserting the privilege of infancy to avoid the terms and conditions of the license he took and the services he received from Epic while using his rights under the license to access Fortnite and retain the benefits of such access. *See id.*

Defendant is also barred from disavowing the agreements because it is through them that he has access to Fortnite, access he is using for unlawful purposes. In doing this at the same time as he asks the Court to shield him from his obligations under those agreements, Defendant is attempting to use the infancy defense as a sword, which is forbidden. *See iParadigms*, 544 F. Supp. 2d at 481 ("[T]he infancy defense cannot function as 'a sword to be used to the injury of others, although the law intends it simply as a shield to protect the infant from injustice and wrong.'") (citing *MacGreal*, 167 U.S. at 701) ("To say that the consideration paid to [a minor] . . . is not in her hands, when the money has been put into her property in conformity with the disaffirmed contract, and notwithstanding such property is still held and enjoyed by her, is to . . . make the privilege of infancy a sword to be used to the injury of others, although the law intends it simply as a shield to protect the infant from injustice and wrong.")); *accord E.K.D. ex rel. Dawes*, 885 F. Supp. 2d at 899; *iParadigms*, 544 F. Supp. 2d at 481 ("Plaintiffs received benefits from entering into the Agreement with iParadigms. They received a grade from their teachers, allowing them the opportunity to maintain good standing in the classes in which they were enrolled. Additionally, Plaintiffs gained the benefit of standing to bring the present suit. Plaintiffs cannot use the infancy defense to void their contractual obligations while retaining the benefits

of the contract."); *cf. Shepherd v. Shepherd*, 408 Ill. 364, 97 N.E.2d 273, 282 (1951) ("The privilege of minority . . . is to be used as a shield and not as a sword. A minor's right to disaffirm upon coming of age, like the right to disaffirm in any other case, should be exercised with some regard to the rights of others, certainly with as much regard to those rights as is fairly consistent with adequate protection of the rights of the minor himself.") (citation omitted).

Defendant's use and sale of his cheat software is profoundly detrimental to Epic and the Fortnite community which it serves. Defendant's cheating and inducing and enabling of others to cheat ruin the game play experience of players who do not cheat because cheats create an uneven playing field, violate universally understood notions of fair play, and diminish the integrity of the game. Defendant's conduct is damaging to Epic because cheating by even a relatively small number of players can ruin the experiences of many others. Defendant ruins not only the games in which he personally plays and cheats, but also those in which people cheat using the hacks he advertises and sells. Each one of these games is important to the other people playing it. None of those other players enjoy being cheated. Nobody likes playing with cheaters. (*See* Comp. ¶¶8-13, 56-62, 69.)

It would be inequitable to allow Defendant to disaffirm his obligations under the TOS and EULA after he has irrevocably taken (and continues to take) the benefits of those agreements and uses the access to Epic's software he was given based on his assent to such agreements as a weapon against Epic and the Fortnite community. The Court should not permit Defendant to avail himself of the privilege of the infancy defense because of this and because of his ongoing inequitable and unlawful conduct.

     c.     <u>The TOS and EULA require that those who enter into them either be the age of majority or do so with the consent of a parent or legal guardian.</u>

Defendant's second mischaracterizations is his assertion that the TOS and EULA "explicitly state that they cannot be entered into by children" (Def. Brief, p.4). This is demonstrably untrue. The pertinent section of the EULA, which is the same operative language as is in the TOS, is:

> **TO ENTER INTO THIS LICENSE AGREEMENT, YOU MUST BE AN ADULT OF THE LEGAL AGE OF MAJORITY IN YOUR COUNTRY OF RESIDENCE.** YOU ARE LEGALLY AND FINANCIALLY RESPONSIBLE FOR ALL ACTIONS USING OR ACCESSING OUR SOFTWARE, INCLUDING THE ACTIONS OF ANYONE YOU ALLOW TO ACCESS TO YOUR ACCOUNT. **YOU AFFIRM THAT YOU HAVE REACHED THE LEGAL AGE OF MAJORITY, UNDERSTAND AND ACCEPT THIS AGREEMENT (*INCLUDING ITS DISPUTE RESOLUTION TERMS*). IF YOU ARE UNDER THE LEGAL AGE OF MAJORITY, YOUR PARENT OR LEGAL GUARDIAN MUST CONSENT TO THIS AGREEMENT.**

EULA (DE 1-6, p.2) (emphasis added); (*see also* TOS DE 1-5, p.2). Thus, what the EULA and TOS actually require is that a user who seeks Epic's permission to use and play Fortnite must either have reached the legal age of majority or, if he or she is under that age, his or her parent or legal guardian must consent to the agreement. (*See* DE 1-5 at p.2; DE 1-6 at p.2).

As a condition to being granted access to Fortnite, Defendant accepted and acknowledged these terms in the following statement: "I have read and agree with the End User License Agreement." (Lawson Dec. ¶9.) He also represented that he had reached the legal age of majority or that his parent or legal guardian consented to this agreement, (*see* DE 1-5, p.2; DE 1-6, p.2), something he now says is not true. (C.B. Dec. ¶¶ 4, 12, 15-16). And Defendant repeated this practice every time he created a new account to access Fortnite after having been banned and every time he installed or reinstalled Fortnite on his PC.

Defendant purposefully entered into two contracts with Epic: the TOS and the EULA. He enjoyed the benefits of those contracts before and after this lawsuit was filed. He abused the

license granted under the agreements by committing copyright infringement and conducting a business built upon gaining improper access to and infringing Epic's copyrighted software.

Since Defendant cannot give back or disgorge the benefits of the agreements into which he entered to obtain access to Fortnite, it would be inequitable to now release him from the obligations and consequences attached to those benefits. *See E.K.D. ex rel. Dawes*, 885 F. Supp. 2d at 900 ("Since Plaintiff cannot give back, or in any way disgorge, the benefit of her contract, it would be inequitable to now release her from the obligations and consequences attached to that benefit.") (*quoting Morrow v. Norwegian Cruise Line Ltd.,* 262 F.Supp.2d 474, 476 (M.D. Pa. 2002)) (holding that a forum-selection clause valid and enforceable against a minor passenger). It is appropriate, therefore, to hold him to the rest of the bargain and enforce the forum selection agreement. *Id*.

In sum, the agreements are enforceable against Defendant despite his claim that he is an infant and did not read them. He waived any objections to venue and jurisdiction in this State. This Court can properly exercise jurisdiction over him and should do so. Defendant's motion should be denied.

**B.** **SPECIFIC JURISDICTION EXISTS IN NORTH CAROLINA PURSUANT TO NORTH CAROLINA'S LONG-ARM STATUTE.**

There is a second and independent basis for this Court's exercise of jurisdiction over Defendant: the North Carolina long-arm statute. Jurisdiction over a defendant exists when, as here, the specific controversy relates to or arises out of that defendant's contacts with North Carolina. *See Broadus v. Delta Air Lines, Inc.*, 101 F.Supp.3d 554, 559 (M.D.N.C. 2015) ("Appraising this connection is a fact-intensive inquiry, with the focus in every case 'on the relationship among the defendant, the forum, and the litigation.'" ) (quoting *Walden v. Fiore*, ___ U.S. ___, 134 S.Ct. 1115, 1121 (2014)). Although Epic did not expressly define which

19

level

PPAB 5081023v7

Case 5:19-cv-00250-FL Document 23 Filed 08/26/19 Page 19 of 31

provision of the long-arm statute applies to Defendant in the Complaint, there is no requirement that it do so, merely that sufficient facts be alleged to satisfy the jurisdictional inquiry. *See Morehead Associates, Inc. v. Intuitive Mfg. Systems, Inc.*, 2006 WL 1911078 (W.D.N.C. 2006) ("Although [plaintiff] has not indicated which portions are applicable herein, subsection 1-75.4(5) authorizes jurisdiction in cases involving contracts.").

As the alleged facts demonstrate, specific jurisdiction over Defendant in this case exists pursuant to N.C. Gen. Stat. § 1-75.4(4), which provides for jurisdiction in an action claiming (1) injury to person or property in North Carolina, (2) arising out of an act or omission outside the state by Defendant, (3) provided that at or about the time of the injury solicitation or services activities were carried on in the State by Defendant or products made by the defendant were used within the State in the ordinary course of trade.

The provisions of the long-arm statute are to be construed liberally, giving North Carolina courts "the full jurisdictional powers permissible under federal due process." *Dillon v. Numismatic, Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). Contrary to Defendant's assertions, he has engaged in "services activities" and "products made by the Defendant" have been used in the State. Defendant sells his Fortnite cheat software. (Comp. ¶¶88-91.) At the time of the filing of the Complaint and after the filing of his Motion to Dismiss, these sales were sometimes conducted using a website located at <nexuscheats.cc> and through a website called "Shoppy." (Comp. ¶88, Exh. B.) Since he filed his Motion to Dismiss, Defendant has created a new website located at <nexuscheats.us>. On this new website, Defendant advertises a variety of cheat software for Fortnite, and has a status page which shows whether those products are categorized as "Undetected" (safe to use), "Testing" (might be detected or causing quick bans for some people, use at your own risk), or "Down" (outdated/detected or

updating). (Lawson Dec. ¶¶20-22.) Defendant has also publicly performed a video of himself infringing Epic's copyrights in Fortnite while giving advice to customers who purchased his cheat software to use in Fortnite to the detriment of other players. (*Id.* ¶¶15-18, Exh. 9)

Every single person who uses one of Defendant's Fortnite cheats must first enter into contractual relationships with Epic in order to access Fortnite. (Comp. ¶¶35, 47.) The use of those cheats in Fortnite injures Epic, a North Carolina-based company, because it diminishes the integrity of the game for the other people playing that game. (Comp. ¶¶10-13.) Every time Defendant promotes the sale of his Fortnite cheats or provides support to the use of those Fortnite cheats by others, he satisfies the long-arm statute's requirements under Sections 1-75.4(4)(a) and 1-75.4(4)(b).

As more fully explained below, holding Defendant accountable in North Carolina for his online conduct which has injured Epic is consistent with federal due process, which provides the only boundary for interpreting North Carolina's long-arm statute. In *Lostutter v. Olsen*, 2017 WL 3669557 (M.D.N.C. 2017), the Middle District analyzed the Fourth Circuit's rule for when online activities are sufficient for jurisdiction under North Carolina's long-arm statute. The Fourth Circuit's jurisdictional standard for "electronic contacts" is based on *Zippo Manufacturing Company v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D.Pa. 1997), and has three parts:

> a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*Lostutter*, 2017 WL 3669557, at *8 (quoting *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002)).

PPAB 5081023v7

In *Lostutter*, the plaintiff accused several out-of-state individuals of engaging in a scheme to defame him by creating a website and posting defamatory content on that website. *Id.* at *2. The defendants also posted false information about the plaintiff's business, located in Kernersville, North Carolina. *Id.* Using the Fourth Circuit's "electronic contacts" test, the court held that the plaintiff had made a *prima facie* showing of the court's jurisdiction over the defendant for the first and second factors based on its allegations that the plaintiff "directed electronic activity into North Carolina by posting defamatory material on a website accessible in North Carolina" and those posts created a cause of action for the plaintiff. *Id.* at *9.

The court then considered whether there were sufficient allegations to establish that the defendant had acted with "the manifested intent of engaging in business or other interactions within the State." The court concluded there were, even though "it [did] not appear that [the plaintiff] intended to engage in business in North Carolina herself, but several of the posts in question, some of which [the plaintiff] allegedly made personally . . . evince an intent to discourage [the defendant's] customers from doing business with him, referring to his business by name and location." *Id.* at *9. The court concluded that "[i]n part because [the defendant's] business was a brick-and-mortar store located in Kernersville, North Carolina, [the defendant's] attempts to disrupt his business were likely aimed at North Carolina." *Id.* The court therefore denied the defendant's motion to dismiss for lack of personal jurisdiction.

Defendant uses his products to infringe Epic's copyrights, sells his products to others so that they may infringe Epic's copyrights, and services those products to enable them to do so. He has built a business on selling cheat software to be used while playing Epic's game and boasts online about avoiding Epic's attempts to prevent his misconduct. (Lawson Dec. ¶¶15-22, Exhs. 9, 12.) Moreover, his own characterization of his reason for engaging in this behavior is that "it

was a great opportunity for me to build a brand for myself." (Lawson Dec. ¶10, Exh. 5.) This conduct is sufficient to satisfy North Carolina's long-arm statute.

## C.   EXERCISING JURISDICTION OVER DEFENDANT COMPORTS WITH DUE PROCESS

Specific jurisdiction requires "that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend [himself] in that state." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). It is appropriate for this Court to exercise jurisdiction over Defendant if Epic's cause of action "arises out of the defendant's contacts with the forum." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005). The Fourth Circuit has held that there are three factors to consider when determining whether to exercise specific jurisdiction: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301-02 (4th Cir. 2012) (per curiam). Defendant's conduct satisfies all three factors.

### 1.     Defendant has purposefully availed himself of the privilege of conducting activities in North Carolina.

The standard for "purposeful availment" is less stringent than Defendant claims; it requires only that a defendant's presence not be "a result of random, fortuitous, attenuated contacts." *Burger King*, 471 U.S. at 474. "If a defendant has created a "substantial connection" to the forum, then it has purposefully availed itself of the privilege of conducting business there." *Lostutter*, 2017 WL 3669557 at *8 (citing *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000).

As discussed above, Defendant's connection with North Carolina was created through

PPAB 5081023v7

electronic contacts, and the *Zippo* test, as adopted by the Fourth Circuit, applies to the jurisdictional analysis. *Zippo* created a "sliding scale" model, in which a defendant who "clearly does business over the Internet" is on the end most likely to support jurisdiction, and at the other end "are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions." *Zippo*, 952 F. Supp. at 1124. Defendant, as someone who has engaged in commercial activity with Epic by repeatedly making unauthorized derivative works of Fortnite, which he publicly performs and publishes on YouTube to an audience of tens of thousands, and who has created a business of advertising and selling cheat software online, clearly fits in the "does business over the Internet" category.

In similar situations, North Carolina courts have found that such electronic contacts satisfied the jurisdictional inquiry. Similar to *Lostutter*, the defendant in *Bell v. Brownie*, 2016 WL 447723 (W.D.N.C. 2016), moved to dismiss for lack of personal jurisdiction, arguing that his minimal electronic contacts with North Carolina were insufficient. He specifically argued "that at the time he discovered ZeekRewards, he was unaware that the website originated in North Carolina . . . he did not purposely avail himself of the privilege of doing business in North Carolina, nor did he direct activities into this state or manifest an intent to do so." *Id.* at *4. The court disagreed, finding that the defendant "voluntarily and intentionally signed up" for a program "stated to be 'headquartered' in North Carolina," and his conduct "involved the knowing and repeated transmission of computer files over the Internet." *Id.* (quoting *Zippo*, 952 F.Supp. at 1124). Based on those electronic contacts, the court denied the defendant's motion to dismiss.

Similarly, in *Butterball, LLC v. Jos Sanders, Inc.*, 2016 WL 5957564 (E.D.N.C. 2016), the court upheld jurisdiction based on the fact that "[d]efendant has offered its allegedly

infringing products for sale on its interactive website and has therefore directed electronic activity into North Carolina." The defendant argued that its website highlighted the "local character" of its Michigan-based business, countering the idea that it had directed electronic activity into North Carolina. *Id.* at *3. The court rejected that argument, finding that the website "also prominently displayed on defendant's website . . . that it ships its products anywhere in the United States." *Id.* Defendant's website, offering electronic products which are digitally delivered to his customers, similarly satisfies the needed minimal electronic contacts test.

Under the Fourth Circuit's articulation of the *Zippo* test, Defendant has purposefully directed his digital activities into North Carolina. The self-serving claims in Defendant's declaration that he did not know that Epic is a North Carolina company should be given no weight at this stage in the proceeding. *See generally U.S. v. Woods*, 2008 WL 9375548 (E.D.N.C. 2008) (refusing to credit defendants' "series of conclusional, self-serving statements provided in affidavits created to support their opposition to the motion for summary judgment"). Defendant's claimed lack of knowledge—which is difficult to believe given Epic's prominent statement in its "About" section on its website that it is headquartered in Cary, North Carolina— should be no more persuasive than the same failed argument rejected by the court in *Brownie*.

### 2. Defendant's tortious conduct fully satisfies the *Calder* test.

As an alternative to the purposeful availment inquiry, *Calder v. Jones*, 465 U.S. 783 (1984), a unanimous Supreme Court held that a court may exercise specific jurisdiction over a defendant based on whether the effects of the defendant's intentionally tortious conduct were felt in the state. The Court reasoned that the defendant knew its conduct "would have a potentially devastating impact" on the plaintiff, and that "the brunt of that injury would be felt by [the plaintiff] in the state in which she lives and works." *Id.* at 789. Therefore, the Court held that

PPAB 5081023v7

"[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Id.* at 790. *Calder's* reasoning was further supported a year later in *Burger King*, *supra*, in which the Court explained the "several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who 'purposefully directs' his activities toward forum *residents*." *Id.* at 473 (emphasis added). "A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Id.* (citation omitted). The Court then emphasized the unique considerations at play when out-of-state defendants who benefited from their tortious conduct tried to escape jurisdiction:

> Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.

*Id.* at 473-74 (citation omitted). A defendant trying to defeat jurisdiction in this context "must present a compelling case." *Id.*

It is clear that the injury caused by Defendant's tortious behavior is felt by Epic in North Carolina. Copyright infringement has been characterized as a tort for the purposes of the *Calder* test. *See, e.g., Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1570 (Fed.Cir.1994); *accord Musselwhite v. International Learning Works Inc.*, 1997 WL 34588522 (M.D.N.C. 1997). In *Musselwhite*, the court concluded that it could make the "reasonable inference" that the defendant's alleged acts of copyright infringement "were committed with knowledge that harm would occur in this forum" based in part on the fact that the copyright registration listed the plaintiff's North Carolina address. *Musselwhite*, 1997 WL 34588522, *3.

Here, Defendant has repeatedly shown that he was aware his conduct was directed at and

impacted Epic. For instance, in his June 21, 2019 video, Defendant said "f*ck Epic Games . . . at least they can't come after my channel anymore, I'm never going to make a Fortnite video . . . they can just f*ck their brand on their own." (Lawson Dec. ¶10, Exh. 5.) He made another Fortnite video a few weeks later, demonstrating his cheat software and offering advice on how to purchase, use, and share his cheat software. (Lawson Dec. ¶¶14-18.) Defendant's explanation for his conduct? "It's really hard to make it as a content creator in this community . . . just being a good player isn't good enough anymore, so you have to do something that stands out, and no one cheats in this game, so it was a great opportunity for me to build a brand for myself." (Lawson Dec. ¶10, Exh. 5.)

It is reasonable for this Court to infer that Defendant knew his conduct was wrongful, knew that Epic would be injured by his conduct, knew that the impact of that harm would be felt by Epic in its home forum, and that he purposefully engaged in this conduct for his own benefit. Accordingly, the allegations in the Complaint support this Court exercising jurisdiction over Defendant under *Calder*.

**3. Epic's claims arise directly out of Defendant's electronic contacts with North Carolina.**

Defendant has used cheat software to create unauthorized derivative works based on Fortnite, publicly performed such works to advertise and sell cheat software for others to use while playing Fortnite, and offers technical support to his customers who use his cheat software while playing Fortnite. These activities violate Epic's legally protected interests in its copyrighted works. Epic's claims for copyright infringement, contributory copyright infringement, and two claims for circumvention of technological measures in violation of the DMCA, all arise directly from these contacts.

PPAB 5081023v7

4. **Exercising personal jurisdiction over Defendant is constitutionally reasonable.**

The constitutional reasonableness analysis "ensures that litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a 'severe disadvantage in comparison to his opponent.' " *CFA Inst. v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009) (citation omitted). Defendant, although a minor, has chosen to engage in business that crosses State lines and has a significant adverse impact in North Carolina. Moreover, Defendant has obtained counsel in North Carolina (whom he has described as "a very, very good attorney") (Lawson Dec. ¶16), which has been held to mitigate the burden on out-of-state defendants. *CFA Inst.*, 551 F.3d at 296 (holding that requiring an Indian company to litigate in Virginia was not "particularly burdensome" because the Indian company "has been able to secure counsel to represent its interests, and its litigation burden is thus no more substantial than that encountered by other entities that choose to transact business in Virginia").

Additionally, "North Carolina has a strong interest in protecting its citizens from local injury caused by the tortious conduct of foreign citizens." *Saxon v. Smith*, 125 N.C. App. 163, 173, 479 S.E.2d 788, 794 (1997) (citing *Ciba-Geigy Corp., v. Barnett*, 76 N.C. App. 605, 609, 334 S.E.2d 91, 93 (1985)). This interest in heightened when the dispute is over a foreign actor's tortious conduct, and North Carolina courts have held "[i]n light of the powerful public interest of a forum state in protecting its citizens against out-of-state tortfeasors, the court has more readily found assertions of jurisdiction constitutional in tort cases." *Ciba-Geigy Corp. v. Barnett*, 76 N.C.App. 605, 609, 334 S.E.2d 91, 93 (1985). North Carolina also "has an interest in ensuring that the nation's copyright . . . laws are not violated within its borders." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 305 (4th Cir. 2012).

PPAB 5081023v7

It is constitutionally reasonable to exercise jurisdiction over Defendant, and this Court should do so.

**D. SHOULD THE COURT FIND THAT THE COMPLAINT AND SUPPORTING EXHIBITS FAIL TO PROVIDE A *PRIMA FACIE* SHOWING OF PERSONAL JURISDICTION, PLAINTIFF REQUESTS THAT THE COURT ORDER LIMITED JURISDICTIONAL DISCOVERY.**

Epic respectfully submits that the Court "must give [Epic] an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." *Williamson*, 645 F.2d at 414; *Eaton*, 692 F.2d at 730. Accordingly, should the Court find that the present record is insufficient to establish jurisdiction in any respect, Epic requests the opportunity to proceed with limited discovery to explore and verify jurisdictional facts, including Defendant's business and sales activities in North Carolina.

**E. IF THE COURT FINDS IT DOES NOT HAVE JURISDICTION OVER DEFENDANT, THE COURT SHOULD TRANSFER THIS CASE TO THE CENTRAL DISTRICT OF ILLINOIS.**

Finally, if this Court were to conclude that it cannot exercise its jurisdiction over Defendant, Epic respectfully submits that the Court should transfer the case to the Central District of Illinois, the forum in which Defendant resides, pursuant to 28 U.S.C. § 1406(a) because doing so would be in the interests of justice. *See* 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong . . . district shall . . . if it be in the interest of justice, transfer such case to any district . . . in which it could have been brought."); *see also Feller v. Brock*, 802 F.2d 722, 729 n. 7 (4th Cir. 1986) ("Although a motion by one of the parties is ordinarily required for transfer, the district court may consider the possibility of transfer *sua sponte*.").

## V. CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.

PPAB 5081023v7

This the <u>26th</u> day of August, 2019.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/Christopher M. Thomas
Catharine B. Arrowood
N.C. State Bar No. 6984
cbarrowood@parkerpoe.com
Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Catherine R.L. Lawson
N.C. State Bar No. 44574
catherinelawson@parkerpoe.com
PNC Plaza
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone:     (919) 835-4626
Facsimile:     (919) 834-4564

*Attorneys for Plaintiff Epic Games, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS** was electronically filed on this day with the Clerk of Court using the CM/ECF system and a true and accurate copy was sent by U.S. Mail addressed to the following:

> Jonathan D. Sasser
> ELLIS & WINTERS LLP
> P.O. Box 33550
> Raleigh, NC 27636
> jon.sasser@elliswinters.com
>
> David L. Hecht
> Yi Wen Wu
> PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
> 277 Park Avenue, 45th Floor
> New York, NY 10172
> dhecht@piercebainbridge.com
> wwu@piercebainbridge.com

This 26th day of August, 2019.

PARKER POE ADAMS & BERNSTEIN LLP

/s/ Christopher M. Thomas
Christopher M. Thomas
N.C. Bar No. 31834
christhomas@parkerpoe.com
Catharine B. Arrowood
N.C. State Bar No. 6984
cbarrowood@parkerpoe.com
Catherine R. L. Lawson
N.C. Bar No. 44575
catherinelawson@parkerpoe.com
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 828-0564
Facsimile: (919) 834-4564
*Attorneys for Plaintiff*